IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| TYMIKIA M. McCLARTY, | ) | CASE NO. 1:12-cv-00041 |
| | ) | |
| Plaintiff, | ) | JUDGE DAN AARON POLSTER |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| MICHAEL J.ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff  Tymikia M. McClarty ("Plaintiff" or "McClarty") seeks judicial review of the

final decision of Defendant Commissioner of Social Security ("Commissioner") denying her

application for social security disability benefits.  Doc. 1.  This Court has jurisdiction pursuant to

42 U.S.C. § 405(g).  This matter has been referred to the undersigned Magistrate Judge for a

Report and Recommendation pursuant to Local Rule 72.2(b)(1).

For the reasons stated below, it is recommended that the Commissioner's decision be

**AFFIRMED**.

## I.  Procedural History

### A.      Prior Applications

Plaintiff received SSI benefits as a child due to mental retardation.  Doc. 30, 213.  In

2000, Plaintiff filed for, but was denied, benefits as an adult.  Tr. 213, 223.  She filed again in

2004 and was allowed benefits with an onset date of October 7, 1999.  Tr. 213.   Following a

2005 Cooperative Disability Investigation Unit ("CDIU") investigation, the CDIU issued a

determination of finding of Fraud or Similar Fault.[1]  Tr. 211-245.  As a result, Plaintiff's claim

was reopened through February 2005, her benefits were terminated, and she was found to have

received overpayments of over $26,000.00.  Tr. 211.  The Finding of Fraud or Similar Fault was

based on discrepancies in the record regarding Plaintiff's reports of symptoms and functional

limitations.[2]  Tr. 213-214, 223-224, 230.

## B.    Current Application

Plaintiff filed her current application for Supplemental Social Security Income ("SSI")

Benefits on June 11, 2009, alleging disability since February 13, 2008.[3]  Tr. 10, 31-32, 112-114,

130.  She alleged disability based on a tumor on her liver, pain in her left leg and right foot, past

nervous breakdowns, mental retardation and depression.  Tr. 64-67, 71-73, 130, 200.  Upon

initial review, the state agency denied Plaintiff's claim and, in doing so, determined, as it had in

2006, that there was fraud or similar fault in this claim.  Tr. 64-65, 169-170.   The state agency

determined that "there is reason to believe that you knowingly concealed and incorrectly

provided information about your ability to complete daily activities and work related activities.

---

[1] "[S]imilar fault is involved with respect to a determination if -- (i) an incorrect or incomplete statement that is material to the determination is knowingly made; or (ii) information that is material to the determination is knowingly concealed."  42 U.S.C. § 1383(e)(7)(B)(i)-(ii).  If there is reason to believe that fraud or similar fault is involved in providing evidence, the Commissioner shall disregard any evidence.  42 U.S.C. § 1383(e)(7)(A)(ii).  If, after re-determining eligibility, after a finding of fraud or similar fault, the Commissioner finds insufficient evidence to support benefits, the Commissioner may terminate eligibility or treat payments made on the basis of insufficient evidence as overpayments.  42 U.S.C. § 1383(e)(7)(C).

[2] There were numerous discrepancies noted, including Plaintiff reported that she did not graduate from high school while her mother reported that she remembered Plaintiff graduating (Tr. 213, 223); Plaintiff claimed that she did nothing during the day while her father reported that she went outside daily, watched tv, did laundry and dishes and talked on the phone for three hours a day (Tr. 213, 223-224); Plaintiff claimed mental problems while her father reported that she only had physical problems and no problems with concentration, memory or completing tasks and her brother reported that she had no problems getting along with others or managing money and handled stress well (Tr. 213); Plaintiff provided different accounts of a fall out of a window in 1999 (Tr. 213); Plaintiff acted in a bizarre manner at a consultative examination in November 2004 (Tr. 214, 230) while, at a later  examination in January 2005, her speech was organized and no unusual material was reported (Tr. 230).

[3] In her Brief on the Merits, Plaintiff alleges a disability onset date of October 7, 1999, which is supported by the record.  Tr. 112.  However, the ALJ determined that Plaintiff alleged disability beginning February 13, 2008, which is likewise supported by the record.  Tr. 130.

Therefore, in accordance with the Social Security Act, it is appropriate to disregard any information that you reported regarding your impairments." Tr. 64-65.  Upon reconsideration, the state agency affirmed the denial.  Tr. 71-73.  Plaintiff requested a hearing, (Tr. 74-76) and an administrative hearing was held before Administrative Law Judge Thomas Randazzo ("ALJ") on May 5, 2011.  Tr. 24-61.

In his June 23, 2011, decision (Tr. 7-23) the ALJ determined that McClarty had not been under a disability since June 11, 2009, the date she filed her application. Tr. 19.  Plaintiff requested review of the ALJ's decision by the Appeals Council.  Tr. 6, 207-209.  On December 5, 2011, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-5.

## II. Evidence

### A.    Personal and Vocational Evidence

Plaintiff was born on August 7, 1978.  Tr. 112, 124.  She was 29 years old at the time of the alleged onset of her disability, February 13, 2008.  Tr. 124.  She has no children.  Tr. 289.  At the time of the hearing she was living with her 73-year-old grandmother and 60-year-old uncle in a house.  Tr. 28.  In 1999, she was involved in an accident where she was thrown or fell out of a window.  Tr. 40.  She attended Glenville High School through the 12th grade.  Tr. 136.  Plaintiff last worked in 2007 at Ohio News Bureau sorting newspapers.  Tr. 31, 130.  Her longest employment, as a nurse's aide, ended after about 2 years, when the 1999 accident occurred.  Tr. 55, 131.  Plaintiff was incarcerated from April 18, 2001, through July 17, 2004, for theft, receiving stolen property, forgery and abduction.  Tr. 32, 220.  In connection with the abduction charges, Plaintiff was required to register as a sex offender.[4]  Tr. 30, 227.  She testified that the

---

[4] The victim of the abduction was a 6 month old neighbor.  Tr. 216, 218, 297.

forgery charges involved her working with another individual to obtain and cash payroll checks. Tr. 33.

**B.    Medical Evidence**

**1.       Treatment Records**

Plaintiff submitted no treating physician opinions.  She received no continuous treatment for either her physical or mental impairments.[5]

On February 23, 2008, an MRI of Plaintiff's liver revealed a small liver cyst or hemangioma and a fatty liver.  Tr. 268.   On May 8, 2009, Plaintiff was seen for hypertension and abdominal pain.  Tr. 266.  During the May 8, 2008, visit, she reported having had the pain for about 4 months but also reported that it was improving.  Tr. 266.  The treatment notes reflect "[n]ormal examination findings."  Tr. 266.  Plaintiff reported problems sleeping.  Tr. 266.  Her physician indicated that the likely cause of her sleeping problems was sleep apnea and a sleep study was ordered, as it had been in the past.  Tr. 266.

On October 29, 2008, Plaintiff was seen at the emergency room for a cough/bronchitis. Tr. 248-257.  Her physical examination was normal and she was in no acute distress, appeared well, and had a normal gait.  Tr. 250.  She had normal range of motion in her extremities and no edema.  Tr. 249.  At discharge, she was prescribed medication for bronchitis and she was reminded to keep her blood pressure in check.  Tr. 253.

On January 24, 2009, Plaintiff was seen at the emergency room for hypertension.  Tr. 262-265.  She also stated she needed a check up because she had a tumor on her liver and she complained of right side liver pain.  Tr. 264.  The nurse assessed Plaintiff as awake, alert, calm and cooperative.  Tr. 264.  Plaintiff left the emergency room before being seen by a physician.

---

[5] Plaintiff did take medication for her depression.  Tr. 50-51.

Tr. 263.  Treatment notes indicate that Plaintiff was unable to wait to be seen by a physician, left

on her own, and was ambulatory to the door.  Tr. 263.

On March 26, 2009, Plaintiff was seen at the emergency room for right rib pain.  Tr.

274-284.  She indicated that she was concerned about the pain because of previously being told

that she had fatty cells on her liver.  Tr. 275.  Her mental status and musculoskeletal exam were

within normal limits and she was in no acute distress.  Tr. 275.  Again, treatment notes reflect

that Plaintiff left without seeing a doctor.  Tr. 276.

A September 14, 2009, x-ray of Plaintiff's left tibia and fibula showed a normal left

lower leg and no evidence of acute fracture.  Tr. 303.  Also, a September 14, 2009, x-ray of

Plaintiff's right foot showed a normal right foot and no evidence of acute fracture.  Tr. 306.

### 2.     Consultative examining physicians

#### a.     Franklin Krause, M.D. – physical impairments

On August 19, 2009, Franklin D. Krause, M.D., completed a consultative examination.

Tr. 289-294.  Plaintiff reported that, in 1999, she had been thrown off a building and sustained

fractures of her right heel and left femur and tibia.  Tr. 289.  She was wearing a boot, would not

put weight on her right heel and would not allow Dr. Krause to touch it.  Tr. 289, 290.  She

indicated that her left leg gives way from time to time.  Tr. 289.  Upon physical examination,

Plaintiff's abdomen was soft without organs or masses palpable; her peripheral pulses were full

with no cyanosis, edema or clubbing; her deep tendon reflexes were 2+, symmetrical and equal;

there was deformity in the distal third of her left tibia and right foot, particularly the heel; both

calves were of similar girth.  Tr. 290.  Dr. Krause's final diagnoses were: (1) a history of

emotional problems to be evaluated elsewhere; (2) hypertension, poorly controlled,

uncomplicated to this point; (3) status post right heel fracture with significant residual deformity

and pain; and (4) status post ORIF left tibial fracture with intermedulary rod.  Tr. 290.  He noted

that no medical records or x-rays had been provided and that none had been requested.  Tr. 290.

### b.      Margaret Zerba, Ph.D. – mental impairments

On September 10, 2009, Margaret Zerba, Ph. D., conducted a psychological consultative

examination.  Tr. 296-300.  Plaintiff reported that her mother died of lung cancer in 2007.  Tr.

296.  She cried when she talked about her mother's death.  Tr. 296.  Dr. Zerba provided Plaintiff

with information regarding free mental health outpatient services for individuals touched by

cancer.  Tr. 296-297.  Plaintiff recounted the incident in 1999 when she was thrown out of a

window.  Tr. 296. She indicated that there were four men who were trying to rape her and they

eventually threw her out a window.  Tr. 296.  She said a homeless man nearby helped her and

she thought that one of her attackers was caught and got 15 years to life.  Tr. 296.  Plaintiff

reported having panic attacks and Dr. Zerba indicated that Plaintiff was extremely anxious

during the examination.  Tr. 298.  Plaintiff's mood appeared depressed with flat affect.  Tr. 298.

She was unable to explain why she was applying for social security benefits.  Tr. 299.  Based on

a number of Plaintiff's answers to Dr. Zerba's questions, Dr. Zerba opined that Plaintiff was

functioning at best within the low average range of intelligence but she also noted that there was

no objective intelligence test data to support her clinical impression.  Tr. 299.

Dr. Zerba diagnosed Plaintiff with post traumatic stress disorder, panic disorder without

agoraphobia, and adjustment disorder with depressed mood.  Tr. 299.  She assessed Plaintiff with

a GAF score of 46.[6]  Tr. 300.  She opined that Plaintiff's ability to understand and follow

---

[6] GAF considers psychological, social and occupational functioning on a hypothetical continuum of mental health illnesses.  *See* American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Health Disorders*, Fourth Edition, Text Revision.  Washington, DC, American Psychiatric Association, 2000 ("DSM-IV-TR"), at 34. A GAF score between 41 and 50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., few friends, unable to keep a job)."  *Id.*

directions and her ability to pay attention to perform simple, repetitive tasks are not impaired. Tr. 300.  Also, based on Plaintiff's depression, guilt, low self-esteem, frequent panic attacks and trauma issues, Dr. Zerba opined that Plaintiff's ability to relate to others in the work environment and her ability to withstand the stress and pressure of day-to-day work activity were markedly impaired.  Tr. 300.

### 3. State agency reviewing physicians

#### a. W. Jerry McCloud, M.D. – physical impairments

On December 8, 2009, W. Jerry McCloud, M.D., completed a review of Plaintiff's records, including normal x-rays of her left tibia and fibula and right foot.  Tr. 322-323.  Plaintiff reported an inability to bear weight for long periods of time and alleged having a pain level of 9 out of 10 on a bad day and 6 out of 10 on a good day.  Tr. 322.  Having reviewed her file, Dr. McCloud found that Plaintiff's allegations were not consistent with the evidence in the file.  Tr. 322.  He gave weight to the consultative examiner's opinions, physical findings and statements. Tr. 322. He noted that the prior report of investigation indicated that Plaintiff was seen walking without incident and field office observations indicate that Plaintiff has no difficulties with standing or walking.  Tr. 322.  He noted that there had been a prior finding of similar fault.[7]  Tr. 322.  He concluded that Plaintiff's "statements cannot be considered credible."  Tr.  322.  He found no evidence of a severe medically determinable impairment that would prevent work functioning including standing and walking for less than 6 hours in a work day.  Tr. 322.

---

[7] See FN 1 above.

### b.    Carl Leigh, M.D. – physical impairments

On May 12, 2010, Carl Leigh, M.D., reviewed Plaintiff's records and found that, despite her alleged increase in liver pain, there was no evidence of decompensation and Plaintiff's alleged impairments were non-severe.  Tr. 324.  Accordingly, he affirmed Dr. McCloud's December 8, 2009, assessment.  Tr. 324.

### c.    Carl Tishler, Ph.D. – mental impairments

On November 27, 2009, Carl Tishler, Ph.D., completed a Psychiatric Review Technique. Tr. 307-319.  He noted that there were no treating sources and concluded that, because similar fault was found in the current application, Dr. Zerba's report and Plaintiff's Adult Function Report were to be disregarded.  Tr. 319.  Without that information, Dr. Tishler indicated that the evidence was insufficient to make a determination regarding Plaintiff's work functioning abilities.  Tr. 319.

### d.    Kristen Haskins, Psy.D. – mental impairments

On April 28, 2010, Kristen Haskins, Psy.D., reviewed Plaintiff's records and found that there was no new medical evidence, no mental conditioning worsening, no new mental condition and no new limitations due to mental conditions.  Tr. 323.  Accordingly, she affirmed Dr. Tishler's November 27, 2009, assessment.  Tr. 323.

## C.    Testimonial Evidence

### 1.    McClarty's Testimony

McClarty was represented by counsel and testified at the administrative hearing.  Tr. 27-43, 50-51, 54-55.  She indicated that her grandmother and uncle take care of her at home but admitted that she is able to do things for herself such as cook and bathe.  Tr. 27-28.  They

provide financial support for her and make sure that she is ok.  Tr. 42.  If she goes shopping, she needs to use a motorized scooter at the store because her legs give out on her from time to time. Tr. 29-30.  She indicated that she believes she does not have a lot of friends because of her criminal past, in particular, the fact that she is a registered sex offender.  Tr. 30.

She last worked in 2007, for about 30 days, at Ohio News Bureau sorting newspapers. Tr. 31.  She testified that her job there ended following her mother's death and her subsequent nervous breakdowns.  Tr. 31.  Although she thought it may have been related to the date that her prior benefits were terminated, she could not explain why she chose February 13, 2008, as her alleged disability onset date.  Tr. 32.   She has looked for work, including through use of a computer, but indicated that no one wants to hire her because of her problems with her legs and because of her felonies.  Tr. 32-34.

She cannot stand too long without her legs giving out and if she sits too long her legs tighten.  Tr. 33.  Her left leg hurts along with her right foot.  Tr. 37.  The pain in her leg is a burning and pinching sensation.  Tr.  38.  The pain is worse when the weather is real bad or when it is really hot in the house.   Tr. 38.  Also, her right knee pops when she goes downstairs and it swells up a lot.  Tr. 37-38.

Regarding the impact of her alleged mental impairments on her ability to work, she stated that she has her own way of thinking and everybody tells her "oh, Tymikia, you are so crazy." Tr. 35.  She said her depression had worsened following her mother's death four years ago and has not gotten better.  Tr. 39.   On average, about 4 out of 7 days a week, she has bad days with her depression.  Tr. 39-40.  On bad days, she is very snappy and hollers at people.  Tr. 40.  Her depression comes and goes throughout the day.  Tr. 40.  She continues to have nightmares from the 1999 incident where she was thrown, or fell, out of a window but her nightmares are not as

frequent as they once were.  Tr. 40.  Also, following the 1999 accident, she is terrified of steep

stairs and heights.  Tr. 41.  She sits down on her rear to come down stairs.  Tr. 41-42.

She testified that she does not do much during the day.  Tr. 36-37.  She might have lunch

with her grandmother or sit with her grandmother or she might take a short walk to the corner of

the street.  Tr. 36.  She continues to enjoy poetry and music.  Tr. 35-36.  She has a friend with

whom she talks on the phone and who helps her get personal items.  Tr.  37.

### 2.    Medical Expert Testimony

Dr. Donald W. Junglas, board certified specialist in internal medicine, testified at the

administrative hearing as a medical expert ("ME").  Tr. 43-53.  He has practiced in general

medicine for 42 years.  Tr. 43.  Having reviewed the medical evidence, Dr. Junglas offered his

opinion regarding Plaintiff's impairments and functional limitations and his assessment of other

medical opinions of record.  Tr. 43-53.

He opined that Plaintiff's hypertension can be treated with medicine and therefore is not a

severe impairment.  Tr. 45.  Plaintiff's hematoma or benign lesion of her liver do not cause

Plaintiff discomfort or any problems.  Tr. 45.  Therefore, the impairment is not severe.  Tr. 45.

He opined that Plaintiff's right heel fracture with deformity and pain is only a mild impairment,

not severe, because it appears to have healed and it appears that Plaintiff can walk on it now.  Tr.

45-46.  He explained that "status post ORIF left tibial fracture" simply means there was an

operative repair made to the fracture.  Tr. 46.  A rod was inserted to stabilize the fracture until it

healed.  Tr. 46.  He also opined that her right knee and leg impairments were not severe but

recognized that Plaintiff could have knee and leg injuries and resulting pain from the injuries she

sustained during the 1999 accident.  Tr. 46, 52.  He acknowledged that Plaintiff has some

discomfort in her right knee, probably as a result of the fall, but there is no evidence in the record

as to what the problem with her knee is.  Tr. 44.  He noted that x-rays of her knee and leg have been within normal limits.  Tr. 44.  He opined that her obesity would be considered moderately severe.  Tr. 47.  He agreed that she suffers from depression and has a learning disability and that those impairments are severe.  Tr. 44, 46.  He also agreed that she had post traumatic stress disorder but indicated that he believed that it was a mild impairment, but also agreed that it could be severe.  Tr. 51, 52-53.

Although Dr. Junglas acknowledged Plaintiff's multiple impairments of hypertension, musculoskeletal problems, a weight problem, emotional problems and a learning disability, he opined that her impairments are mild, and thus, Plaintiff did not meet or equal a Listing.[8]  Tr. 47. He opined that she would have mild functional limitations in her ability to carry and lift.  Tr. 47. He indicated that with no physical impairments she should be perform medium level work – lift no more than 50 pounds occasionally and up to 25 pounds frequently, but also indicated that, when taking into her obesity, she should never climb ladders, ropes or scaffolds.  Tr. 47-48.  If it were not for her fear of stairs, she could climb stairs.  Tr. 48.  He opined that she should be able to sit for 8 hours, stand for a couple of hours and walk for a couple of hours without the need for ambulation assistance.  Tr. 47.

The ALJ asked the ME to consider Plaintiff's mental depression and learning disability and to rate the paragraph B criteria of activities of daily living, social functioning and concentration, persistence or pace.  Tr. 48-49.  Dr. Junglas opined that Plaintiff has mild limitations in her activities of daily living, moderate limitations in social functioning based on her avoidance of social contact, and mild limitations in concentration, persistence and pace.  Tr.

---

[8] The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience.  20 C.F.R. § 404.1525.

48-49.  Based on the moderate limitation in social functioning, Dr. Junglas opined that Plaintiff

should be limited to superficial interaction with co-workers and the public with no production

quotas or short term requirements.  Tr. 49.  He disagreed with consultative examining physician

Dr. Zerba's findings of marked impairments in relating to others and in dealing with pressure of

day-to-day work activity.  Tr. 49-50.  He stated that he did not see Plaintiff has having marked

impairments in those areas.  Tr. 49-50.   After Plaintiff clarified that she was in fact taking

medication for her depression, Dr. Junglas clarified that his opinion that Plaintiff was not

markedly impaired remained unchanged.  Tr. 50-51.

### 3. Vocational Expert's Testimony

 Vocational Expert Gene Burkhammer ("VE") testified at the hearing.  Tr. 53-60.  After

reviewing Plaintiff's work history records and the inability of Plaintiff to clarify a 2007 self-

employment record showing earnings of about $12,500.00, the ALJ instructed the VE to presume

no past relevant work.  Tr. 54-55.

The ALJ asked the VE to assume an individual of Plaintiff's age, education and work

experience who is limited to medium level work and limited to occasional climbing of ramps and

stairs; never climbing ladder, ropes or scaffolds; limited to frequent balancing, stooping,

kneeling, crouching and crawling; avoiding moderate exposure to hazardous machinery and

unprotected heights; limited to simple, routine, repetitive tasks; limited to superficial interaction

with co-workers and the public; precluded from tasks that involve strict production quotas or

short term requirements; and precluded from tasks that involve arbitration, negotiation or

confrontation.  Tr. 55-56.  The ALJ then asked the VE whether there are jobs that would exist for

such an individual.  Tr. 56.  The VE provided the ALJ with available jobs at the medium, light

and sedentary levels: laundry laborer – medium SVP 2 (600 locally, 5,000 statewide and 100,000

nationally); kitchen helper – medium SVP 2 (2,000 locally, 30,000 statewide and 500,000 nationally); housekeeper cleaner – light SVP 2 (2,000 locally, 30,000 statewide and 500,000 nationally); mail clerk – light SVP 2 (500 locally, 6,000 statewide and 150,000 nationally); addresser – sedentary SVP 2 (300 jobs locally, 3,000 statewide and 40,000 nationally); charge account clerk – sedentary SVP 2 (200 locally, 2,000 statewide and 80,000 nationally); and food and beverage order clerk – sedentary SVP 2 (300 locally, 4,000 statewide and 90,000 nationally).[9]  Tr.  56-57.  The VE testified that if the hypothetical individual was required to miss 4 days a month all of the stated jobs would be eliminated.  Tr. 58.

Upon questioning by Plaintiff's counsel, the VE testified that a sit-stand option would eliminate all jobs except the sedentary jobs.  Tr. 58-59.  If it was a sit-stand option at-will, the VE testified that all jobs would be eliminated because such an option would probably take an individual off task too often.  Tr. 58-59.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

---

[9] SVP refers to the DOT's listing of a specific vocational preparation (SVP) time for each described occupation.  Social Security Ruling No. 00-4p, 2000 SSR LEXIS 8, *7-8 (Social Sec. Admin.  December 4, 2000).   Using the skill level definitions  in 20 CFR §§ 404.1568 and 416.968, unskilled work corresponds to an SVP of 1-2.  *Id.*

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 416.920; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 96 L. Ed. 2d 119, 107 S. Ct. 2287 (1987). Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the Residual Functional Capacity ("RFC") and vocational factors to perform work available in the national economy. *Id.*

### IV. The ALJ's Decision

In his June 23, 2011, decision, the ALJ made the following findings:

1.     McClarty has not engaged in substantial gainful activity since June 11, 2009, the application date.  Tr. 12.

2.     McClarty has severe impairments of obesity, depression, post traumatic stress disorder and learning disability.  Tr. 12.  She does not have severe impairments of benign tumor on liver; left leg, right knee, and right foot pain; hypertension; status post right heel fracture with residual deformity and pain; or status post open reduction and internal fixation left tibial fracture with intermeduallary rod because the impairments can either be controlled with medication or have healed.  Tr. 12-13.

3.     McClarty does not have an impairment or combination of impairments that meets or equals a Listing.  Tr. 13.  She has mild restrictions in activities of daily living, moderate difficulties in social functioning, moderate difficulties with concentration, persistence or pace and no has experienced no episodes of decompensation.  Tr. 13-14.  Based on the testimony of Dr. Junglas, little weight was afforded to the marked impairments contained in the report of consultative examining physician Margaret Zerba, Ph.D.  Tr. 13.

4.     McClarty has the residual functional capacity ("RFC") to perform medium work except she can only occasionally climb ramps and stairs and never climb ladders, ropes or scaffolds.  She can frequently perform balancing, stooping, kneeling, crouching and crawling.  She must avoid moderate exposure to hazardous machinery and unprotected heights.  She is precluded from tasks that involve high production quotas and strict time requirements.  She is precluded from tasks that involve arbitration, negotiation or confrontation.  She is limited to superficial interaction with coworkers and the public.  Tr. 15-18.

5.     McClarty has no past relevant work.  Tr. 18.

6.     McClarty was born on August 7, 1978, and was 30 years old, defined as a younger individual age 18-49, on the date she filed the application.  Tr. 18.

7.     McClarty has at least a high school education and is able to communication in English.  Tr. 18.

8.     Transferability of job skills is not an issue as McClarty does not have past relevant work.  Tr. 18.

9.     Considering her age, education, work experience and RFC, there are jobs that exist in significant numbers in the national economy that McClarty can perform – laundry laborer, kitchen helper, housekeeping cleaner and mail clerk.  Tr. 18-19.

Based on the foregoing, the ALJ determined that McClarty has not been under a disability since June 11, 2009, the date of her application. Tr.  19.

## V. Parties' Arguments

### A.    Plaintiff's Arguments

First, McClarty argues that the ALJ's finding that her mental impairments were not disabling is not supported by the evidence.  Doc. 15, pp. 6-8.  McClarty relies on consultative examining physician Dr. Zerba's findings that McClarty has marked limitations in her ability to relate to others and in her ability to withstand the stress and pressures of day-to-day activities to support her argument and asserts that the ALJ improperly discounted these findings based on the testimony of the medical expert, a non-examining physician who is neither a psychologist or psychiatrist.  Doc. 15, pp. 6-8.   McClarty further asserts that, rather than actually citing allegedly inconsistent evidence to discount Dr. Zerba's opinions, the ALJ relied solely upon the finding of similar fault from 2006 and on the report of Dr. Carl Tishler, Ph.D., a reviewing, but non-examining, physician.  Doc. 15, pp. 6-8.

Second, McClarty argues that the ALJ's credibility assessment is not supported by substantial evidence.  Doc. 15, pp. 9-10.  She argues that the ALJ over-relied upon the similar fault finding.  Doc. 15, p. 9.  McClarty asserts that the similar fault finding that she knowingly supplied false information regarding her intellectual abilities is contradicted by her childhood history of mental retardation and well documented history of learning disability and low average intelligence.  Doc. 15, p. 9.  McClarty also argues that the ALJ's finding that McClarty's allegations regarding the extent of her limitations ignored Dr. Juglas' testimony that the natural progression of the injury sustained by Plaintiff could cause the problems that Plaintiff was having, i.e., knee and leg pain.  Doc. 15, pp. 9-10.

16

**B.** **Defendant's Arguments**

In response, the Commissioner argues that McClarty failed to meet her burden of demonstrating that her impairments prevented her from performing the limited mental demands of unskilled work.  Doc. 16, pp. 12-14.  The Commissioner also argues that the ALJ was not required to adopt the opinion of consultative examining physician Dr. Zerba and he properly considered that opinion in assessing McClarty's RFC.  Doc. 16, pp. 14-16.  The Commissioner argues that the ALJ did not disregard Dr. Zerba's opinion of marked limitations solely on the finding of similar fault but, rather, he weighed the opinion and gave it less weight because it was not supported by the record evidence.  Doc. 16, pp. 16-18.   Finally, the Commissioner argues that the ALJ followed controlling regulations when evaluating Plaintiff's subjective complaints of pain.  Doc. 16, pp. 18-19.

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992).  A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

**A.** **The ALJ's evaluation of the medical opinions was proper and the ALJ's decision that McClarty is not disabled is supported by substantial evidence.**

Plaintiff argues that the ALJ's decision is not supported by substantial evidence because the ALJ did not properly consider or weigh the medical opinions.  In particular, McClarty takes

issue with the ALJ's consideration of and treatment of Dr. Zerba's opinion that McClarty had marked impairments in her ability to relate to others in the work environment and in her ability to withstand stress and pressures of day to day work activity.

Dr. Zerba was a one-time examining physician.  Accordingly, her opinion is not entitled to controlling weight.  *See Barker v. Shalala*, 40 F.3d. 789, 794 (6th Cir. 1994).  Even though her opinion is not entitled to controlling weight, the ALJ considered her opinion and weighed it in accordance with the applicable regulations.[10] Tr. 13-18.  *See* 20 C.F.R. § 416.927.  Furthermore, the Regulations make clear that a claimant's RFC is an issue reserved to the Commissioner and the ALJ assesses a claimant's RFC "based on all of the relevant medical and other evidence" of record.  20 C.F.R. §§ 416.945(a)(3); 416.946(c), *see also Coldiron v. Comm'r of Soc. Sec.*, 391 Fed. Appx. 435, 439 (6th Cir. 2010) ("The Social Security Act instructs that the ALJ – not a physician – ultimately determines a Plaintiff's RFC").

The ALJ considered Dr. Zerba's opinion using factors set forth in the Regulations, including supportability of the opinion, consistency of the opinion with the record as a whole, and other factors of which the ALJ is aware that tend to support or contradict the opinion, and concluded that he should give little weight to Dr. Zerba's opinion.  While not the sole factor, the ALJ considered the findings of similar fault and gave weight to Dr. Tishler's assessment which found that, based on the finding of similar fault, Dr. Zerba's report should be disregarded because it was based on Plaintiff's statements to Dr. Zerba which were not entirely credible.  Tr. 17, 319.  Additionally, the ALJ found that Dr. Zerba's opinions were not consistent with or supported by Dr. Junglas' opinions.  Tr. 17.  The ALJ agreed with and gave great weight to the opinions of Dr. Junglas who is a specialist in internal medical with board certification and who

---

[10] The factors to be considered when determining the weight to be provided to a medical opinion are: (1) examining relationship; (2) treatment relationship; (3) supportability; (4) consistency; (5) specialization; and (6) other factors known which tend to support or contradict the opinion.  20 C.F.R. § 416.927(c).

has practiced in general medicine for 42 years.  Tr. 17, 43.  Although Dr. Junglas did not examine the Plaintiff he was present at the administrative hearing where he observed and heard from the Plaintiff.  Tr. 24-61.  Further, he reviewed the medical evidence prior to rendering his opinions at the hearing.  Tr. 43.  Thus, the ALJ's reliance upon the opinion of Dr. Junglas was neither improper nor misplaced.  In addition to looking to Dr. Junglas' opinion to determine whether there was support for Dr. Zerba's extreme limitations, the ALJ also noted that there were no treating source opinions.  Tr. 17.  Notwithstanding the ALJ's decision to provide little weight to Dr. Zerba's opinions regarding marked impairments, the ALJ did find moderate limitations in Plaintiff's social functioning and in her ability to maintain concentration, persistence or pace.  Tr. 14.  He accounted for these limitations in the RFC by precluding her from tasks that involve high production quotas and strict time requirements or arbitration, negotiation or confrontation and limited her to superficial interaction with coworkers and the public.  Tr. 15.

While Plaintiff attempts to argue that there is evidence to support Dr. Zerba's opinions and/or evidence to support a finding that Plaintiff was being forthright with Dr. Zerba, even if substantial evidence or, indeed, a preponderance of the evidence supports a claimant's position, a reviewing court may not overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ."  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).   As shown, there is substantial evidence to support the ALJ's conclusion regarding Dr. Zerba's opinion.  Accordingly, Plaintiff's argument that the ALJ's decision not to accept Dr. Zerba's findings of marked limitations was error is without merit and not a basis for reversal.

**B.      The ALJ's credibility assessment was proper and in supported by substantial evidence.**

Social Security Ruling 96–7p and 20 C.F.R. § 416.929 describe a two-part process for assessing the credibility of an individual's subjective statements about his or her symptoms. First, the ALJ must determine whether a claimant has a medically determinable physical or mental impairment that can reasonably be expected to produce the symptoms alleged; then the ALJ must evaluate the intensity and persistence associated with those symptoms to determine how those symptoms limit a claimant's ability to work.   When evaluating the intensity and persistence of a claimant's symptoms, consideration is given to objective medical evidence and other evidence, including: (1) daily activities; (2) the location, duration, frequency, and intensity of pain or other symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms; (5) treatment, other than medication, received for relief of pain or other symptoms; (6) any measures used to relieve pain or other symptoms; and (7) other factors concerning functional limitations and restrictions due to pain or other symptoms.  20 C.F.R. § 416.929(c); Soc. Sec. Rul. 96–7p, 1996 SSR LEXIS 4, at *5–8 (1996).  "[A]n ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility.  Nevertheless, an ALJ's assessment of a claimant's credibility must be supported by substantial evidence."  Calvin v. Comm'r of Soc. Sec., 437 F. Appx. 370, 371 (6th Cir. 2011) (citing Walters v. Comm'r of Soc. Sec., 127 F.3d 525, 531 (6th Cir.1997)).

After considering the entire case record and conducting a thorough credibility analysis, the ALJ determined that McClarty's allegations were generally not credible and the ALJ gave

them little weight.  Tr. 13-18.   Again, while not the sole determinative factor in his credibility analysis, the ALJ did consider the finding of similar fault in the current application and the past finding of similar fault.  Tr. 16, 17.  He noted that she had given different accounts of the 1999 accident when she was thrown from, or fell out of, a window.  Tr. 16, 213.   He also noted her past criminal history which includes crimes involving dishonesty, i.e., forgery.  Tr. 16.  Plaintiff attempts to minimize the finding of similar fault based on a well documented history of learning disability and low average intelligence.  Doc. 15, p. 9.  However, the records are not as supportive as Plaintiff would suggest.  For example, in Dr. Zerba's report, she states that her clinical impression that Plaintiff was functioning at best within the low average intelligence was not supported by any objective tests.  Tr. 299

The ALJ also considered the Plaintiff's activities of daily living.  Tr. 14.  She shops at the grocery store but stated that she needs to use a scooter because her legs give out from time to time.  Tr. 15.  Although her grandmother provides Plaintiff with some assistance, the ALJ noted that Plaintiff does have the ability to cook for herself and take care of herself.  Tr. 14.

Also, like Dr. Junglas, the ALJ considered objective medical evidence including  the x-rays of Plaintiff's left leg and right foot from September 14, 2009, which were both normal.  Tr. 15, 17-18, 303, 306.   The ALJ also considered the opinion testimony of Dr. Junglas regarding the severity of Plaintiff's physical problems (Tr. 16) as well as the report of Dr. Krause wherein it was stated that Plaintiff was capable of self-care and that she took Motrin and Vicodin for her pain. (Tr. 16, 289-290).  During the examination with Dr. Krause, the Plaintiff wore a boot on her right foot.  Tr. 16, 289-290.  She would not bear weight on her foot and Dr. Krause was not permitted to touch her foot.  Tr. 16, 289-290.

The ALJ also considered the fact that field office observations indicated that Plaintiff had no difficulty standing or walking. Tr. 15, 17, 126-127.  This observation is further supported by a 2009 medical treatment record where it was noted that Plaintiff was "ambulatory to [the] door." Tr. 263.

Further, in assessing McClarty's credibility, the ALJ reviewed and considered medical opinions regarding both mental and physical impairments, and he also noted that the record was devoid of any opinion from a treating source concerning Plaintiff's alleged physical or mental impairments.  Tr. 17.

Following the above described detailed consideration of the record, the ALJ concluded that the record did not support the severity of pain alleged by Plaintiff or the need for assistive devices or a sit-stand option and Plaintiff's statements as to the severity of her mental and physical conditions were not consistent with the evidence in the file. Tr. 13-18.  The ALJ is charged with assessing credibility and an ALJ's credibility assessment is to be accorded great weight and deference.  Having reviewed the ALJ's decision, the undersigned finds that the ALJ's thoroughly reasoned credibility analysis regarding the severity of McClarty's impairments is supported by substantial evidence.  Thus, the ALJ's credibility assessment is not a basis for reversal.

### VII. Conclusion and Recommendation

For the foregoing reasons, it is recommended that the Commissioner's decision be **AFFRIMED**.


Dated:  December 21, 2012

Kathleen B. Burke
United States Magistrate Judge

## **OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  See *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).